UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


TERRY HIGHTSHOE,         )
          )
    Plaintiff,        )
          )
    v.         )      No.  2:14 CV 63 JMB
          )
CAROLYN W. COLVIN,         )
Acting Commissioner of Social Security,    )
          )
    Defendant.        )

**MEMORANDUM AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration. The suit involves an Application for Disability Insurance Benefits under Title II of the Social Security Act.  Plaintiff has filed a Brief in Support of his Complaint, and the Commissioner has filed a Brief in Support of her Answer.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.    Procedural History**

On January 5, 2012, Plaintiff Terry Hightshoe filed an Application for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq.  (Tr. 203-04)[1]  Plaintiff states that his disability began on December 30, 2010, as a result of depression, bipolar disorder, learning disability, history of head trauma, and multiple physical impairments.  On initial consideration, the Social Security Administration denied Plaintiff's claims for benefits.  (Tr. 147-51)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  On April 22,

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (Docket No. 12/filed September 2, 2014).

2013, a hearing was held before an ALJ. (Tr. 64-110) Plaintiff testified and was represented by counsel. (Id.) Vocational Expert Denise Weaver also testified at the hearing. (Tr. 103-09, 191-92) Thereafter, on June 4, 2013, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 6-18) After considering the representative's brief and the records from University Hospital and Clinics dated June 26,2013 through August 7, 2013, the Appeals Council found no basis for changing the ALJ's decision and denied his request for review on April 21, 2014. (Tr. 1-40, 335-36)[2] The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Forms Completed by Plaintiff

In the Work Activity Report - Employee, Plaintiff reported last working on December 30, 2010, when he was fired "due to my productivity being so slow because my conditions prevented me from going any faster." (Tr. 232)

---

[2] After the unfavorable ALJ determination, Plaintiff submitted evidence to the Appeals Council demonstrating that he had received treatment beginning on June 26 through August 7, 2013. The Appeals Council noted that inasmuch as the ALJ issued his opinion on May 30, 2013, the new medical records cover treatment Plaintiff received at a later time and, therefore, the records do not affect the ALJ's decision regarding whether he was disabled beginning on or before May 30, 2013. "An application for disability benefits remains in effect only until the issuance of a 'hearing decision' on that application." Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.620(a), 416.330). New evidence submitted to the Appeals Council is considered only to the extent it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b). To the extent that these records suggest that Plaintiff's mental condition worsened after May 30, 2013, Plaintiff's recourse is to file a new application for benefits with a later disability onset date of the ALJ's decision in this case. See, e.g., Tarwater v. Astrue, 4:10cv1974 LMB, 2012 WL 381783, at *18 (Feb. 6, 2012) (finding substantial evidence supported the Commissioner's decision despite the existence of treatment notes dated shortly after the ALJ's decision suggesting that Plaintiff's mental condition worsened and noting plaintiff's recourse is to file a new application for benefits).

In the Function Report Adult - Third Party, Plaintiff's wife reported Plaintiff helps with the laundry, mows the lawn, and shovels snow when there is snow, and he goes grocery shopping twice a month.  (Tr. 269)  Plaintiff's hobbies and interests include watching television, playing video games, and playing on the computer, and there has not been any changes in these activities since his conditions began.  (Tr. 273)  Plaintiff attends church weekly, and he has no problems getting along with family, friends, neighbors, or others.  (Id.)

In the Function Report - Adult, Plaintiff reported his daily activities include watching television, playing video games, and eating lunch and dinner.  (Tr. 290-304 )  Plaintiff goes grocery shopping two to three times a month and helps with the laundry and dishes, mows the lawn, and shovels snow.  Plaintiff's hobbies and interests include playing on the computer and X-box and watching television, and he attends church and his child's sporting events.  Plaintiff can walk one mile before he has to rest for five minutes.  Plaintiff plays video games for a couple of hours each day.  (Id.)

In the Disability Report - Appeal, Plaintiff did not allege any worsening or new impairments since he filed the last completed disability report.  (Tr. 307-11)

**B.  Hearing on April 22, 2013**

**1. Plaintiff's Testimony**

At the hearing on April 22, 2013, Plaintiff testified in response to questions posed by the ALJ and counsel.  (Tr. 67-102)  He has a driver's license and drives a couple times a week to attend church and go grocery shopping.  (Tr. 69)  Plaintiff lives in a house with his wife and his twelve year old stepson.  (Tr. 70)  He has a high school education and a year of online college classes in business administration.  (Tr. 76-77)

Plaintiff testified that he started receiving Medicaid one month earlier. (Tr. 70) Plaintiff received unemployment benefits from 2011 through part of 2012. (Tr. 74)

Plaintiff has applied online and in person for all kinds of full time and part time jobs since filing for disability. (Tr. 71, 75) The jobs have included factory work, a stockman at Wal-Mart, and a cashier at Dollar Store. (Tr.) He interviewed for a maintenance job at a gas station, and a sales job for a water treatment company, a job requiring him to interact with customers. (Tr. 72) Plaintiff applied for a cashier job a week before the hearing. (Tr. 75) Plaintiff testified that he would have had difficulties working due to concentration issues and pace. (Tr. 74, 81) Plaintiff also stated that he has difficulty getting along with other people because they annoy him. (Tr. 82) While working, he experienced problems with coworkers. Plaintiff further testified he has trouble being around people in public places, and that being in a crowd of people makes him feel edgy. (Id.)

Plaintiff listed Levothyroxine, Lisinopril, Cymbalta, Prostatin, Abilify, and Trazodone as his medications and reported that the medications help him most of the time without causing any side effects. (Tr. 83) He is not taking any prescribed medication for pain, only over-the-counter Tylenol. (Tr. 86) Plaintiff testified that he had been hospitalized for eight days after he separated from his wife and tried to hurt himself. (Tr. 84) After being discharged, he received treatment at Audrain Medical Center and was then sent to St. Mary's Hospital, because he tried to hurt himself again. (Tr. 84-85)

Plaintiff testified that he has compressed discs in his neck causing him discomfort and poor eyesight in his right eye. (Tr. 85) He also has joint and nerve pain. (Id.)

Plaintiff stated that he could lift twenty-five to thirty pounds three or four times, and he

has no difficulty standing except for a long period of time such as a couple of hours. (Tr. 85-86) Plaintiff testified that so long as he can move around he does not have a problem sitting. (Tr. 86)

Plaintiff's daily activities include watching a lot of television, walking the dog, and playing a game. (Tr. 88) Plaintiff plays video games on either the computer or video game console a couple times a week for an hour each time. (Tr. 89) Plaintiff helps his wife with the household chores by loading the dishwasher and doing the laundry. (Tr. 93) Plaintiff helps his stepson mow the lawn for twenty minutes at a time and shovel snow for fifteen minutes. (Tr. 94) Plaintiff attends church every week and then Bible study with fifteen other people. (Tr. 98)

Plaintiff stopped working in December 2010 as a polybag operator at Mexico Plastic Company. (Id.) Plaintiff's job duties included running two machines at a time, stapling bags to a header, and then inspecting the bags and packing them in a box. (Tr. 99) Plaintiff testified that he was terminated, because of his production problems with speed and quantity. (Tr. 100) In 2006 and 2007, Plaintiff worked as a packer at Thorco Company. Plaintiff removed items off the production line and placed them in boxes. (Id.) When he worked in shipping and receiving in a factory, Plaintiff loaded trucks and removed items off the shelves. (Tr. 101) Plaintiff left this position to help care for his sick father after running out of personal leave time. (Tr. 102) Plaintiff worked as a stock person at a retail store stocking shelves and bringing in carts from 1997 through 2001. (Id.)

## 2. Testimony of Vocational Expert

Vocational Expert, Ms. Denise Weaver, testified at the hearing. (Tr. 103-09) Ms. Weaver characterized Plaintiff's vocational background to include work experience as a bag machine operator, a packer/shipper job in the factory, and a stocker position. (Tr. 104)

The ALJ asked Ms. Weaver to consider the following hypothetical:

to assume a hypothetical individual of the claimant's age, education, and work experience from these jobs that you just described. Please further assume this individual would be able to perform light exertional work as defined by the Dictionary of Occupational Titles. This individual would be able to sit, stand, or walk a total of six hours in an eight hour workday. This individual would be able to frequently operate hand controls with the left hand. This individual cannot climb ladders, ropes, or scaffolds, and could occasionally crouch or crawl; can frequently handle and finger with the left hand, and that would be the nondominant hand; needs to avoid concentrated exposure to the extreme cold, vibration, fumes, odors, dust, gases, and poor ventilation. This individual would also need to avoid concentrated exposure to work at protected heights and being around hazardous machinery. Ms. Weaver, it doesn't look like any of the past jobs could be performed. Could this hypothetical individual perform any other occupations?

(Tr. 104-05) Ms. Weaver opined, based on the hypothetical question, the hypothetical individual could perform jobs such as a counter attendant at a lunchroom or a coffee shop, a counter clerk of photo finishing, and a cashier II. (Tr. 105) When asked whether the individual could still perform the jobs cited if the individual was able to frequently operate hand controls and frequently handle and finger with both hands, Ms. Weaver responded yes. (Tr. 106)

For the second hypothetical, the ALJ asked Ms. Weaver to assume all of the limitations from the first hypothetical and to further assume this individual would be limited to performing simple work with occasional interactions with coworkers, supervisors, or the general public. Ms. Weaver indicated that such individual could work as the counter attendant in a lunchroom or coffee shop, but not the other two jobs noted earlier, and such individual could also perform work as photocopying machine operator, a collator operator, and a mail clerk. (Tr. 106-07)

When asked to assume all of the limitations from the first two hypotheticals and then to further assume "that this individual, because of problems with sustaining concentration, persistence, and pace, would be off task approximately 20 percent of the eight hour workday on

a regular basis, could such a hypothetical individual perform any of the jobs you named or any other occupations?"  (Tr. 108)  Ms. Weaver explained that such individual would not be able to perform any of the jobs inasmuch as these were probationary jobs, and with a probationary employee, employers are more vigilant to assure probationary employees are on task most of the time.  (Id.)

Next, counsel asked if the individual would be absent from the workplace in excess of two days per month on a consistent basis, would the individual be able to perform the jobs identified or any other work in the national economy?  (Tr. 109)  Ms. Weaver noted that the industry wide standards for a first-year employee permit only seven absences during the first year of employment so such individual would not be able to work beyond the probationary period.  (Id.)

## III.    Medical Records and Other Records

### A.    General History

The medical evidence in the record shows that Plaintiff has a history of major depressive disorder, bipolar disorder, generalized anxiety disorder, degenerative disc disease, and left ulnar neuropathy.  (Tr. 337-774)  Although the Court has carefully reviewed all of the medical evidence, only medical records relevant to the ALJ's decision and Plaintiff's challenges to the ALJ's decision are discussed.

To obtain disability insurance benefits, Plaintiff must establish that he was disabled within the meaning of the Social Security Act not later than the date his insured status expired - December 31, 2014.  Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status."); <u>see also</u> 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.

### B.     Keene Family Medicine Clinic - Dr. Mark Beard

During a new patient evaluation on January 6, 2010, completed by Dr. Mark Beard, Plaintiff reported having a past medical history significant for hyperlipidemia, Crohn's disease, HTN, depression, and allergic rhinitis. (Tr. 475) Plaintiff reported an ongoing rash as his main medical concern, and he stated that his other medical issues were controlled at that time. He noted not having any other issues or concerns. (<u>Id.</u>)

In follow-up treatment at the Gastroenterology Clinic on January 26, 2010, Plaintiff noted over the past few months he had noticed worsening of his diarrhea and intermittent blood in his rectal area and reported a rash. (Tr. 429) Dr. Beard scheduled an EGD and colonoscopy. (Tr. 431) On February 5, 2010, lab tests showed Plaintiff's cholesterol was no longer controlled, and his blood pressure was elevated. (Tr. 488) Plaintiff indicated a willingness to restart his cholesterol medication, Lisinopril, inasmuch as he had stopped his medications after his most recent move. He reported his medical conditions were otherwise controlled at that time. (<u>Id.</u>) A MRI of his pelvis showed diverticulosis in the colon and a fat containing left inguinal hernia. (Tr. 401)

On March 1, 2010, Plaintiff underwent a biopsy at Digestive Heatlthcare Clinic which showed mild chronic superficial gastritis, and focal active colitis. (Tr. 419-22) On referral by Dr. Beard for a GI consultation, Plaintiff underwent an EGD to rule out Crohn's disease and received the endoscopic diagnosis of GERD, H-Pylori infection, and a small hiatial hernia. (Tr. 424) The colonoscopy diagnostic report showed focal erythema and ulcers in the ileum

consistent with Crohn's disease, a small possible amount of disease in the transverse colon, and diverticulosis.  (Tr. 426-27)

In follow-up treatment on August 3, 2010, Plaintiff reported being concerned about his dizziness spells, but he did not have any other issues or concerns.  (Tr. 502)  He reported working as a factory worker and being divorced.  (Tr. 503)  Neurologic examination showed Plaintiff to be alert and oriented.  (Tr. 504)  Dr. Beard made the diagnosis of benign paroxysmal positional vertigo and prescribed Meclizine.  (Id.)  On September 30, 2010, Plaintiff returned for follow-up treatment for hyperlipidemia, Crohn's disease, hypertension, depression, and allergic rhintis, and his annual examination.  (Tr. 509)  Plaintiff reported believing that his chronic medical conditions were otherwise controlled at that time, and he was more interested in having treatment for gum pain.  (Id.)  Musculoskeletal examinaton showed Plaintiff had a normal range of motion and strength and no tenderness.  (Tr. 511)  Dr. Beard noted Plaintiff to be cooperative with appropriate mood and affect and normal judgment and treated his oral/dental abscesses with Clindamycin.  (Id.)  An x-ray of his cervical spine showed moderate degenerative changes more prominent at C5, C6, and C7 level, and osteophytosis of the anterior margin and posterior-inferior endplate of the C6 veretbral body with possible neural foramina narrowing at C6-7.  (Tr. 517)  Plaintiff complained of a burning sensation in his left arm and shoulder.  (Tr. 513)  Musculoskeletal examination showed his left shoulder had a good range of motion and no point tenderness, but he had some mild tenderness along left lateral epicondyle.  (Tr. 515)  Dr. Beard noted that the Spurlings test was positive on his left side.  Dr. Beard treated his cervical radiculopathy causing left arm pain by prescribing Neurontin.  (Id.)

**C.      Emergency Room Care - Audrain Medical Center/St. Mary's Health Center**

On April 8, 2010, Plaintiff presented at Audrain Medical Center complaining of abdominal pain. (Tr. 441-47) A CT scan of his abdomen showed diverticulosis of the colon. (Tr. 448) On June 23, 2010, Plaintiff presented in the emergency room exhibiting signs of heat exhaustion after being in the sun running errands. (Tr. 454-56)

On August 20, 2010, Plaintiff received treatment after smashing his left distal index finger in the car door. (Tr. 463) A neurologic examination showed him to be alert and oriented. A psychiatric examination showed him to be cooperative with appropriate mood and affect. (Tr.464, 466)

On November 17, 2011, Plaintiff presented in the emergency room reporting that he had been drowsy for two days. (Tr. 675) On November 30, 2011, Plaintiff presented in the emergency room complaining of feeling weird and being anxious and nervous. (Tr. 663-65)

On September 4, 2012, Plaintiff was transferred from Audrain Medical Center to the health unit at St. Mary's Health Center and reported wanting to cut his wrists and not feeling there is a reason to exist and not having a home and no help from his family. (Tr. 762-67) Plaintiff stated that he was unemployed and had no way to pay for his medications. (Tr. 767) Plaintiff reported having severe marital discord with his wife, and she had kicked him out of the house. (Tr. 768) Clinicians observed that Plaintiff could be easily engaged in group and social activities. (Id.) Plaintiff stated that he last worked in a factory as a machine operator in December 2010 when the factory began to cut employees. (Tr. 769) Plaintiff stated that he was working on an online associate degree in business through Colorado Technical School. Major depressive disorder, partner discord, and psychosocial stressors including primary support issues, marital discord, homelessness, lack of resources, financial, poor support system, possible legal

issues, and unemployment were listed in the clinical impression. (Id., 773) Plaintiff requested assistance with housing and vocational opportunities. (Tr. 769) Plaintiff indicated that his stressors included outstanding bills, denial of disability application, no resources, his mother's passing six months earlier, and lack of family support. (Tr. 771) Dr. John Clemens changed Plaintiff's medication regimen and prescribed Paxil, Trazodone, and Klonopin. (Tr. 773) Dr. Clemens opined that Plaintiff's state of homelessness with absolutely no resources might have been a factor in his presentation. (Id.)

### D. Arthur Center - Dr. Ahmed Taranissi

Between December 22, 2009, and March 12, 2013, Dr. Ahmed Taranissi and Veneta Raboin, MSN, of the Arthur Center treated Plaintiff's depression. (Tr. 553-71, 611-23, 708-17, 722-23, 739-60) In a December 22, 2009, treatment note, Plaintiff reported that he was still working. (Tr. 563) Veneta Raboin, MSN, continued his medication of regimen of Wellibutrin and Celexa and scheduled a follow-up visit in three months. (Id.) On March 23, 2010, Plaintiff reported missing work a couple days a month and being concerned about how his absences could negatively affect his work. (Tr. 562) Plaintiff noted that he did not want to lose his job because he had a new apartment, and he was under stress. (Id.) In treatment on June 22, 2010, Plaintiff reported being cited at work for low production but now having good attendance at work. (Tr. 561) Ms. Raboin noted that Plaintiff arrived on time, and his mood was stable; he had an appropriate affect, good eye contact, logical flow of thought, and good insight and judgment. Ms. Raboin assessed a Global Assessment of Functioning ("GAF") score of 60.[3] (Id.) During

_____

[3] The Global Assessment of Functioning Scale ("GAF") is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental*

treatment on November 20, 2010, Plaintiff reported having a three-day work suspension, because he was below average in production; he blamed his poor production on the machine breaking down. (Tr. 557) Ms. Raboin observed Plaintiff to be anxious and having depressive symptoms, but he was also alert and exhibited normal thought content and fair judgment. (Tr. 557-58) Ms. Raboin replaced Trazodone and Sythroid in his medication regimen. (Tr. 559) On February 19, 2011, Plaintiff reported being unemployed, collecting unemployment benefits, and looking for a job. (Tr. 553) He stated that he lived in a house with his new roommate, and he was happy with her. Ms. Raboin continued Plaintiff's medication regimen. (Tr. 555)

During a psychiatric evaluation on March 25, 2011, Plaintiff reported being unemployed and depressed and having anxiety about his finances. (Tr. 566) Dr. Taranissi noted how he was experiencing episodes of euphoria, mind racing, feeling down, and anxiety. (Id.) Dr. Taranissi found Plaintiff had no risk factors of suicide, his mood was normal, and affect was appropriate and Dr. Taranissi listed Plaintiff's occupational problem as a psychosocial problem and assigned a GAF score of 60. (Tr. 567-68) Plaintiff expressed concern that his mind wandering at school caused his grades to be below average. (Tr. 569) Dr. Taranissi prescribed Celexa, Trazodone, and Cymbalta. (Id.)

During treatment on July 19, 2011, Plaintiff reported that he was looking for a job and having concentration issues. (Tr. 611) Plaintiff had occasional depressive symptoms and stressors including finding a job and finances. Plaintiff reported that he had been taking college

_Disorders_ ("DSM-IV"), 32 (4th ed. 1994). A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Id. at Text Revision 34 (4th ed. 2000) (DSM-IV-TR). A GAF score between 51 and 60 indicates moderate symptoms (_e.g.,_ flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (_e.g._, few friends, conflicts with peers or co-workers).

course online for the last year.  Plaintiff noted that his medications were helping him stabilize his mood and control his depression.  (Id.)  Dr. Taranissi observed Plaintiff to be alert with normal thought content and logical flow of thought, fair insight and judgment, but he was anxious, irritable, and depressed.   (Tr. 612-13)  Dr. Taranissi increased Plaintiff's Cymbalta dosage and decreased his Celexa dosage.  (Tr. 614)  In follow-up treatment on September 20, 2011, Plaintiff reported that he ran out of Cymbalta for three days and when he resumed taking Cymbalta, he felt shaky.  (Tr. 615)  Plaintiff continued to take college courses online, but he would have to retake a course.  Plaintiff stated that he had remarried earlier in the month.  (Id.)  Dr. Taranissi observed Plaintiff to be alert but anxious with normal speech and logical flow of thought.  (Tr. 616)  Dr. Taranissi found he had good insight and judgment.  (Tr. 617)  Dr. Taranissi continued his medication regimen.  (Tr. 618)  On November 29, 2011, Plaintiff reported experiencing mood fluctuations and disturbed sleep patterns.  (Tr. 713)

During treatment on January 27, 2012, Plaintiff complained of fatigue, feeling irritable, and mood fluctuations.  (Tr. 713)  Examination showed Plaintiff was alert with an anxious mood, appropriate affect, and logical flow of thought.  (Tr. 714)  Dr. Taranissi observed Plaintiff to be well oriented with good insight and judgment.  (Tr. 715)  Dr. Taranissi prescribed Wellbutrin and Seroquel and recommended therapy.  (Tr. 716-17)  In follow-up treatment on March 23, 2012, Plaintiff reported that his mother died the prior week, and he was not able to visit her due to transportation issues.  (Tr. 708)  Plaintiff had been applying for jobs at a number of places including a job unloading trucks and taking classes online.  Because of his wife's neuropathy, Plaintiff had taken over more responsibilities.  (Id.)  Dr. Taranissi assigned a GAF score of 55 and added Sertraline to his medication regimen.  (Tr. 711)

In the Medical Source Statement - Mental completed on May 4, 2012, Dr. Taranissi found Plaintiff to be moderately limited in his ability to remember work-like procedures and to understand and remember detailed instructions.  (Tr. 722)  In the area of sustained concentration and persistence, Dr. Taranissi noted Plaintiff to be moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to maintain regular attendance, to sustain ordinary routine, to work in coordination with or proximity to others, and to complete a normal workday.  (Tr. 722)  In the area of social interaction, Dr. Taranissi further found Plaintiff to be moderately limited in his ability to interact appropriately with the general public, to accept instructions, and to get along with coworkers or peers.  (Tr. 723)  Finally, Dr. Taranissi determined Plaintiff to be moderately limited in his ability to respond appropriately to changes in the work setting, to travel in unfamiliar places, and to set realistic goals.  (Id.)

On May 29, 2012, Plaintiff reported being frustrated with his job search and that he has been arguing with his wife about finding a job.  (Tr. 753)  Plaintiff  had helped clean his house, walking to the grocery store a mile from his house, and playing computer games.  Plaintiff indicated that he had experienced occasional down feelings, and he had financial stressors.  (Id.)  Dr. Taranissi noted Plaintiff's mood to be irritable, and his affect and eye contact to be appropriate.  (Tr. 754)  Plaintiff's medication regimen helped his depression, but did not completely control his irritability.  Dr. Taranissi observed symptoms of anxiety and depression, but his findings on the mental status examination were otherwise normal.  (Id.)  Dr. Taranissi found Plaintiff had good insight and judgment and logical flow of thought and normal thought content and continued his medication regimen of Seroquel, Zoloft, and Cymbalta with some

adjustments.  (Tr. 755-57)  In follow-up treatment on July 27, 2012, Plaintiff reported that he had

been looking for a job and submitting applications everywhere now that he unemployment

benefits had expired.  (Tr. 749)  Plaintiff stated he was frustrated, because he takes care of all the

household chores without any assistance from his wife.  Plaintiff reported that he was better able

to control his anger.  Dr. Taranissi observed Plaintiff to have symptoms of anxiety and

depression, but he noted that Plaintiff was cooperative, with appropriate affect, good eye contact,

normal speech, and good insight and judgment.  (Id.)  Dr. Taranissi continued Plaintiff's

medication regimen.  (Tr. 752)

On October 16, 2012, Plaintiff reported that he used his fingernails to scratch his wrists

after having an argument with his wife and she asked him to leave.  (Tr. 744)  Plaintiff was

admitted to Royal Oaks Hospital for one week.  Plaintiff indicated that he was living with his

father and feeling down.  Plaintiff exhibited symptoms of anxiety and depression.  (Id.)  Dr.

Taranissi noted that Plaintiff has logical flow of thought, normal thought content, and good

insight and judgment.  (Tr. 745-46)  Dr. Tarassini assigned a GAF score of 45.  (Tr. 747)

In follow-up treatment on February 5, 2013, Plaintiff reported the passing of his father

and his sister-in-law in January.  (Tr. 739)  Plaintiff indicated that he has financial stressors and

has moved back in with his wife after reconciling.  Dr. Tarassini observed Plaintiff exhibited

symptoms of anxiety, but the findings on the mental status examination were otherwise normal.

(Id.)  Plaintiff believed that his medications were helping stabilize his mood.  (Tr. 740)  Dr.

Taranissi observed Plaintiff to be well oriented, and he had good insight and judgment.  (Tr. 741)

Dr. Tarassini assigned a GAF score of 55 and adjusted his medication regimen by adding Abilify

and increasing the Cymbalta dosage and discontinuing Zoloft.  (Tr. 742-43)

In a Medical Source Statement - Mental completed on March 12, 2013, Dr. Taranissi found Plaintiff had the same limitations in the area of understanding and memory as the earlier source statement. (Tr. 759) Dr. Taranissi increased Plaintiff's limitation with respect to his ability to sustain an ordinary routine and to work in coordination with or proximity to others from moderately limited to markedly limited, and increased his limitation with respect to his ability to make simple work related decisions to moderately limited. (Id.) With respect to social interaction, he changed Plaintiff's rating from moderately limited to markedly limited in his ability to accept instructions and to get along with coworkers or peers and changed from not significantly limited to moderately limited in his ability to maintain socially appropriate behavior. (Tr. 760) Dr. Taranissi increased Plaintiff's ability to respond appropriately to changes in the work setting and to set realistic goals from moderately limited to markedly limited and increased his ability to be aware of normal hazards from not significantly limited to moderately limited. (Id.)

**E.    Royal Oaks Hospital**

As noted above, Plaintiff was admitted to Royal Oaks Hospital on August 26, 2012, after his wife kicked him out of the house one day earlier and told him she was filing for divorce. (Tr. 729, 733) Plaintiff indicated that he "felt like my life is falling apart and felt like ending it." (Id.) Plaintiff reported that his concentration was not very good, and his energy level was not good. Plaintiff stated that he has been looking for a job for almost two years without success. Plaintiff reported that he last worked in a factory in 2010, but he was let go due to cut backs. (Id.) Plaintiff explained that he thought about committing suicide the day before his admission but now he felt "lost." (Tr. 730) Plaintiff indicated that he was currently working on his

associate degree online and has vocational training.  (Id.)  Dr. Iyad Khreis noted Plaintiff's affect

and mood were depressed, his memory was intact, and his insight and judgment were fair.  (Tr.

731)  Bipolar disorder, anxiety disorder, and partner relational problem were listed in his

provisional diagnosis.  Dr. Khreis prescribed Zoloft and BuSpar, continued Cymbalta and

Seroquel, and increased his Neurontin dosage.  (Tr. 731-32)  Plaintiff was admitted and placed

on elopement and suicidal precautions and given Vistaril for agitation or anxiety.  (Tr. 726)  In a

Master Treatment Plan, Dr. Khreis identified suicidal ideation with a plan and depressive

symptoms as his problems and adjusted his medication regimen.  (Id.)  During a psychiatric

session on August 28, 2012, Plaintiff's affect was noted to be depressed, and he denied any

suicidal ideation, intent, or plan.  (Tr. 727)  Plaintiff reported that he was doing better.  During

psychiatric sessions, Plaintiff reported no side effects or difficulties from the medications.  Dr.

Khreis noted Plaintiff had a stable mood and affect and some anxiety at the time of discharge,

and recommended Plaintiff continue his current medication regimen and individual therapy.  (Tr.

727-28)  Dr. Khreis assigned his GAF ast 60.  (Tr. 728)

      **F.**        **MEDZOU Community Health Clinic**

      Between February 24 through December 15, 2011, Plaintiff received treatment for

potential perianal fistula.  (Tr. 574-95)  Plaintiff reported that his past medical health significant

for hypothyroidism, depression, Crohn's disease, hyperlipidemia, and poor vision, but these

conditions were stable.  (Tr. 574-95)  In a Social Services Assessment form, Plaintiff indicated

that he would like job training or education resources.  (Tr. 576)  Plaintiff stated he was

previously on Medicaid, but he lost coverage when he exceeded the income guidelines after he

started a job.  (Tr. 595)  During follow-up treatment on April 7, 2011, Plaintiff indicated that he

has numbness in his left hand and loss of strength and difficulty concentrating. (Tr. 589) Plaintiff received a medication regimen of Gabapentin and Wellbutrin. (Id.) On May 12, 2011, Plaintiff returned for prescription refills and reported increased numbness in his left hand and having muscle spasms in his neck and arm. (Tr. 585) Plaintiff reported that his depression was much better, and his mood was improving. (Tr. 585-86)

On July 14, 2011, Plaintiff returned for medication refills and complained of headaches and neck pain. (Tr. 642) Examination showed moderate tenderness to palpitation of his cervical spine and the provider noted that he was in a good mood. (Id.) In follow-up treatment on September 8, 2011, Plaintiff admitted that he does not always take his psychiatric medications, and his mood had been stable. (Tr. 637-38) On December 15, 2011, Plaintiff returned for prescription refills and reported memory loss, but reported that his depression was pretty well controlled. (Tr. 631) The provider encouraged Plaintiff to exercise and lose weight. (Tr. 624)

### G.     University of Missouri Health Care

On March 12, 2012, Plaintiff presented at the emergency room complaining of lower extremity swelling. (Tr. 699-706) During treatment, the doctor observed Plaintiff to be alert and oriented to person, place, time, and situation; his speech was normal; and his mood and affect were appropriate. (Tr. 705) Musculoskeletal examination showed a normal range of motion and no tenderness. (Id.)

### H.     Other Record Evidence

#### 1.     *Psychiatric Review Technique - Dr. Barbara Markway*

In a Psychiatric Review Technique completed on June 20, 2011, Dr. Barbara Markway, state agency psychological consultant, found Plaintiff's impairments of affective disorders and

anxiety-related disorders not to be severe.  (Tr. 596)  In support, Dr. Markway cited the

treatment records from the Arthur Center and MEDZOU, and that Plaintiff received medications

for his symptoms.  In particular, Dr. Markway noted that during treatment on May 25, 2011,

Plaintiff reported his depression improving with medication.  (Tr. 606)  Dr. Markway found

Plaintiff to have mild functional limitations of activities of daily living and difficulties in

maintaining social functioning, and moderate functional limitations in difficulties in maintaining

concentration, persistence, or pace.  (Tr. 604)

### 2.    *Mental Residual Functional Capacity Assessment*

In a Mental Residual Functional Capacity Assessment, Dr. Markway found Plaintiff to

not be significantly limited in his ability to remember work-like procedures and to understand

and remember very short and simple instructions, and moderately limited in his ability to

understand and remember detailed instructions.  (Tr. 608)  With respect to sustained

concentration and persistence, Dr. Markway found Plaintiff to be moderately limited in his

ability to carry out detailed instructions and to maintain attention and concentration for extended

periods, and not significantly limited in his ability to carry out very short and simple instructions,

to perform activities with a schedule and maintain regular attendance, to work within

coordination with or proximity to others, and to make simple work-related decisions.  (Tr. 608-

09)  In the areas of sustained concentration and persistence, Dr. Markway determined that

Plaintiff was not significantly limited in any area of social interaction, including his ability to get

along with coworkers and to interact appropriately with the general public, or adaptation.  (Tr.

609)

## IV.    The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014.  (Tr. 46)  Plaintiff has not engaged in substantial gainful activity since December 30, 2010, his alleged onset date.  The ALJ found Plaintiff has the severe impairments of degenerative disc disease of the cervical spine, left ulnar neuropathy, major depressive disorder, bipolar disorder, and generalized anxiety disorder, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 46-47)  The ALJ found that Plaintiff has the residual functional capacity to perform light work except he can occasionally crouch or crawl; and he can frequently operate hand controls with his left hand and frequently handle and finger with his left upper extremity. (Tr. 48) The ALJ found that Plaintiff can sit for six hours out of an eight hour workday, and stand or walk for six hours out of an eight hour workday.  The ALJ further found that Plaintiff cannot climb ladders, ropes, and scaffolds; and he must avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, and poor ventilation as well as to unprotected heights and hazardous machinery.  Lastly, the ALJ found Plaintiff is limited to simple work with only occasional interactions with coworkers, supervisors, or the general public.  (Id.)  The ALJ found Plaintiff is unable to perform any past relevant work.  (Tr. 53)  Plaintiff has at least a high school education and is able to communicate in English.  (Tr. 54)  The ALJ found that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers in the national economy he could perform including a photocopy machine operator, a collator operator, and a mail clerk.  (Id.)  The ALJ concluded Plaintiff has not been disabled within the meaning of the Social Security Act at any time from December 30 2010, through the date of the decision.  (Tr. 55)

**V.     Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If he is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, he is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment,

the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, he is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will he be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-
        exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon
        a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Plaintiff contends the ALJ erred in weighing the opinions of treating psychiatrist, Dr.

Ahmed Taranissi, non-examining, state agency psychologist Kyle DeVore, Ph.D, and non-

examining, state agency psychological consultant, Barbara Markway, Ph.D.

## A.      **Treating Psychiatrist Dr. Ahmed Taranissi**

Plaintiff argues the ALJ erred in weighing the opinion of treating psychiatrist, Dr.

Taranissi.  He contends that the ALJ failed to provide good reasons for affording no weight to

Dr. Taranissi's Medical Source Statement - Mental dated March 12, 2013, setting forth moderate

and marked limitations.

Opinions from medical sources who have treated a claimant typically receive more

weight than opinions from one-time examiners or non-examining sources.  See 20 C.F.R. §

416.927(c)(1)-(2).  However, the rule is not absolute: a treating physician's opinion may be

disregarded in favor of other opinions if it does not find support in the record.  See Casey v.

Astrue, 503 F.3d 687, 692 (8th Cir. 2007).  Likewise, an ALJ may appropriately rely on non-

examining opinions as part of the RFC analysis.  See Hackler v. Barnhart, 459 F.3d 935, 939

(8th Cir. 2006) (ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors). Ultimately, it is up to the ALJ to determine the weight that each medical opinion is due. Id. at 936 (ALJ's task is to resolve conflicts in evidence).

The undersigned finds that the ALJ considered Dr. Taranissi's limitations set forth in the Medical Source Statement - Mental and gave no weight to his opinions in the written opinion as follows:

> Likewise, Dr. Taranese's[*sic*] opinion dated March 12, 2013, is given no weight. In that document, Dr. Taranese indicated that the claimant would have some marked limitations. As in his previous opinion, this degree of limitation is only vaguely defined, and the limitations assessed are presented in a "check-box" format without further explanation. Furthermore, this opinion is inconsistent with Dr. Taranes's[*sic*] own treatment notes through July 2012, which indicate that the claimant was generally doing well during that period with stable moods and few medication adjustments. Likewise, the records on file for the period after claimant's hospitalizations in August and September 2012 show that the claimant's condition has improved since reconciling with his wife in February 2013.

(Tr. 52) (internal citations omitted)

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original)). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial

medical evidence contained within the record.'" Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir.

2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).  The ALJ is charged

with the responsibility of resolving conflicts among the medical opinions.  Finch v. Astrue, 547

F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is

an error to give an opinion controlling weight simply because it is the opinion of a treating

source if it is not well-supported by medically acceptable clinical and laboratory diagnostic

techniques or if it is inconsistent with other substantial evidence in the case record."  1996 WL

374188, at *2 (S.S.A. July 2, 1996).  SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927

require the ALJ to provide "good reasons in the notice of the determination or decision for the

weight given to a treating source's medical opinion(s)."  Id. at *5.

The ALJ acknowledged that Dr. Taranissi was a treating source psychiatrist, but that his

opinions set forth in the March 12, 2013, Medical Source Statement - Mental ("Mental

Statement") were not entitled to controlling weight, because they are inconsistent with the

objective medical evidence in the record.  See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir.

2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a

whole, the ALJ can accord it less weight.").  As noted by the ALJ, Dr. Taranissi's opinions are

also inconsistent with his own treatment notes inasmuch as he never found such mental

limitations during treatment.  Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (affirming

ALJ's rejection of treating physician's opinions about claimant's exertional limitations that

"[were] not reflected in any treatment notes or medical records).  Opinions of treating doctors are

not conclusive in determining disability status and must be supported by medically acceptable

clinical or diagnostic data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion).

The record shows Dr. Taranissi treated Plaintiff on ten occasions from March 25, 2011, through February 5, 2013. Dr. Taranissi treated Plaintiff five weeks before completing the mental statement, but he did not report the conditions and symptoms that he claims render him totally disabled. Plaintiff indicated that he had financial stressors and moving back in with his wife after reuniting. After conducting a mental status examination, Dr. Tarassini observed Plaintiff exhibited symptoms of anxiety, but the findings on the mental status examination were otherwise normal. Plaintiff reported that his medications were helping stabilize his mood. Dr. Taranissi observed him to be well oriented, and he had good insight and judgment. Dr. Tarassini assigned a GAF score of 55 and adjusted his medication regimen. It is significant that no examination notes accompanied the Mental Statement.

Dr. Taranissi's opinions are inconsistent with his own clinical treatment notes. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010); see also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes). Because Dr. Taranissi's opinions are not supported by his treatment notes, the ALJ discounted those opinions. See Wildman, 596 F.3d at 964 (rejecting challenge to lack of weight given treating physician's opinion where the physician renders inconsistent opinions that undermine the credibility of such opinions); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating

physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment).  During treatment on May 29, 2012, Plaintiff reported helping clean his house, walking to the grocery store a mile from his house, and playing computer games.  Plaintiff indicated that he had experienced occasional down feelings, and while his medication regimen helped his depression, it did not completely control his irritability.  Dr. Taranissi observed symptoms of anxiety and depression, but his findings on the mental status examination were otherwise normal.   In follow-up treatment on July 27, 2012, Plaintiff reported that he had been looking for a job and submitting applications everywhere after his unemployment benefits had expired.[4]  Plaintiff stated he was frustrated, because he took care of the household chores without any assistance from his wife.  Dr. Taranissi observed Plaintiff to have symptoms of anxiety and depression, but he noted that Plaintiff was cooperative, with appropriate affect, good eye contact, normal speech, and good insight and judgment.  On October 16, 2012, Dr. Taranissi noted that Plaintiff exhibited symptoms of anxiety and depression, but he had logical flow of thought, normal thought content, and good insight and judgment.  In follow-up treatment on February 5, 2013, Plaintiff reported the passing of his

_____

[4]Another negative consideration was Plaintiff's continuing search for work - some for the same types of jobs the ALJ found he could perform with his RFC.  See Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) ("[T]his record of contemplating work [including applying for jobs related to and unrelated to his previous work] indicates [the claimant] did not view his pain as disabling.")  Looking for work is inconsistent with complaints of disabling impairments. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001)  Plaintiff's testimony during the hearing and his reporting during medical treatment that he continued to apply for jobs that were similar to his previous work during his alleged period of disability is inconsistent with disability. Bentley, 52 F.3d at 786.  Indeed, during the hearing, Plaintiff indicated that he had interviewed for some jobs and even a job requiring him to interact with customers.  The fact that Plaintiff applied for jobs which required him to be in close contact and interact with customers detracted from the credibility of his allegations of an inability to be around people.  It also conflicted with Dr. Taranissi's opinion.

- 27 -

father and his sister-in-law in January. Plaintiff indicated that he had financial stressors and had

moved back in with his wife after reconciling. Dr. Tarassini observed Plaintiff exhibited

symptoms of anxiety, but the findings on the mental status examination were otherwise normal.

Plaintiff reported that his medications were helping stabilize his mood. Dr. Taranissi observed

him to be well oriented, and having good insight and judgment and assigned a GAF score of 55.

A review of Dr. Taranissi's treatment notes shows he never imposed any mental

limitations or any work restrictions on Plaintiff. See Fischer v. Barnhart, 56 F. App'x 746, 748

(8th Cir. 2003) ("in discounting [the treating physician's] opinion, the ALJ properly noted that ...

[the treating physician] had never recommended any work restrictions for [the claimant]"). Dr.

Taranissi's treatment notes do not reflect the degree of limitation he indicated in his March 12,

2013, Medical Source Statement - Mental. The relevant lack of supporting evidence includes the

absence of any restrictions placed on Plaintiff by Dr. Taranissi during his treatment of Plaintiff.

See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011). The undersigned concludes that the

ALJ did not err in affording no weight to Dr. Taranissi's opinions of March 12, 2013.

Likewise, the ALJ found another reason to discount Dr. Taranissi's opinions. The ALJ

noted that the checklist mental evaluation completed by Dr. Taranissi was not supported by any

narrative explanation or reference to objective medical evidence, both of which are reasons for

according the Mental Statement no weight. See Anderson, 696 F.3d at 794 ("[A] conclusory

checkbox form has little evidentiary value when it cites no medical evidence, and provides little

or no elaboration) (internal quotations omitted). A checklist format and conclusory opinions,

even of a treating physician, are of limited evidentiary value. Wildman v. Astrue, 596 F.3d 959,

964 (8th Cir. 2010).

In Wildman, the Eighth Circuit held that the ALJ had properly discounted a treating physician's assessment as conclusory when that "opinion consist[ed] of three checklist forms, cite[d] no medical evidence, and provide[d] little to no elaboration." 596 F.3d at 964. See also Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The checklist format, generality, and incompleteness of the [RFC] assessments limit their evidentiary value."). Further, the Mental Statement appears to have been procured by, and submitted to, Plaintiff's counsel. The Mental Statement does not refer to any clinical tests or findings, and as noted below, was inconsistent with Dr. Taranissi's own prior treatment notes.

Further, no other examining physician in any treatment notes stated that Plaintiff was disabled or unable to work or imposed mental limitations on his capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The medical records do not evidence any significant abnormalities, or deficits with respect to Plaintiff's concentration, attention, pace, persistence, activities of daily living, focus, orientation, or abilities to cope with stress, and to interact with coworkers and supervisors. In the Function Report Adult - Third Party, Plaintiff's wife reported that Plaintiff had no problems getting along with family, friends, neighbors, or others. During treatment, clinicians observed that Plaintiff could be easily engaged in group and social activities. During the hearing, Plaintiff discussed that he attended a weekly Bible study with fifteen other people.

Thus, the ALJ did not err in giving no weight to Dr. Taranissi's opinions. The ALJ

properly accorded Dr. Taranissi's opinions in the March 12, 2013, Medical Source Statement - Mental no weight inasmuch as his findings were inconsistent with, and unsupported by, the evidence of record including his own treatment notes. See Davidson Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (ALJ may discount a treating physician's opinion if it is not supported by the doctor's own treatment records); Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (ALJ permitted to discount medical source's opinions in MMS where limitations listed on the form stand alone and were never mentioned in numerous treatment records nor supported by objective testing or reasoning); see also Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (little evidentiary weight accorded to functional limitations set out in MSS check-off form because previous treatment notes did not report any significant limitations); Halverson, 600 F.3d at 930 (inconsistency between treating physician's treatment records and his functional assessment provides good reason for ALJ to discount physician's opinion). The record as a whole in this case, including the inconsistencies in Dr. Taranissi's treatment notes and his Medical Source Statement - Mental and the effectiveness of medication, casts doubt on his limitations. As noted by Plaintiff, Dr. Taranissi found Plaintiff to have the cognitive ability and memory to perform simple work, but he opined that Plaintiff had more severe limitations in his ability to interact with coworkers and supervisors. As discussed, the record refutes a more severe limitation. The ALJ found Plaintiff had moderate difficulties in social functioning and concentration, persistence, and pace and accounted for these limitations in the RFC by limiting him to simple work, with only occasional interactions with coworkers, supervisors, and the general pubic. Having reviewed the record and the ALJ's reasoning, the undersigned finds the ALJ provided sufficient rationale for the weight he gave to Dr. Taranissei's opinions set forth in the March 12,

2013 Mental Statement.

**B.** **State Agency Opinions**

Plaintiff also contends that the ALJ erred in weighing the opinions of non-examining, state agency psychologist Kyle DeVore, Ph.D, and non-examining, state agency psychological consultant Barbara Markway, Ph.D.

On March 2, 2012, non-examining, state agency psychological consultant Dr. Kyle DeVore, Ph.D, completed a Disability Determination Explanation finding Plaintiff had no severe mental impairments. (Tr. 123-33) The ALJ gave little weight to this opinion inasmuch as the evidence "entered into the record after Dr. DeVore made his assessment indicates a higher degree of limitation than assessed at that time." (Tr. 52)

In the Psychiatric Review Technique and the Mental Residual Functional Capacity Assessment completed on June 20, 2011, state agency psychological consultant Barbara Markway, Ph.D opined that Plaintiff has the ability to understand, remember, and carry out simple work instructions, and could adequately interact with peers and supervisors. (Tr. 596-610) The ALJ accorded partial weight to Dr. Markway's opinions citing the "[e]vidence obtained at the hearing level suggests that the claimant is more limited than [her] opinion indicates." (Tr. 52)

All evidence from nonexamining sources is considered to be opinion evidence. 20 C.F.R. § 404.1527(e). "[An] ALJ is entitled to rely on the opinions of reviewing physicians when considering whether a claimant meets thee requirements of a listed impairment." Ostronski v. Chater, 94 F.3d 413, 417 (8th Cir. 1996) (citing § 404.1527(e)).

Plaintiff contends that by discounting the opinion evidence from Drs. DeVore and

Markway, the ALJ left the record devoid of any evidence upon which he could base his RFC assessment. Plaintiff's argument is misplaced. The absence of opinion evidence does not undermine an ALJ's RFC determination where other medical evidence in the record as well as other evidence in the record supports the finding. See Cox v. Astrue, 495 F.3d 614, 619-20 (8th Cir. 2007); see also Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (lack of opinion evidence not fatal to RFC determination where ALJ properly considered available medical and testimonial evidence). Because sufficient medical evidence support the ALJ's RFC assessment, the ALJ did not err in his determination.

## VI.   Conclusion

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.


Dated this  24th   day of July, 2015.

_/s/ John M. Bodenhausen_
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE